Law Offices
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
(212) 309-6000 (Telephone)
(212) 309-6001 (Fax)
Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
TRACEY ATTIS,

       Plaintiff,

  -against-          No. 07-CV-949

SOLOW REALTY DEVELOPMENT CO.,   ***ELECTRONICALLY FILED***
STEVEN CHERNIAK, SHELDON SOLOW,
and JENNIFER BIER (in their official and   **Oral Argument Requested**
individual capacities),

       Defendants.
-------------------------------------------------------X

## DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

  Defendants Solow Realty & Development Company, LLC, (incorrectly identified in the Complaint as Solow Realty Development Co.) ("Solow Realty"), Steven Cherniak ("Cherniak"), Sheldon Solow ("Solow"), and Jennifer Bier ("Bier") (collectively "Defendants"), by and through their attorneys, Morgan, Lewis & Bockius LLP, hereby submit this Rule 56.1 Statement of Undisputed Facts in Support of their Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Local Civil Rules for the United States District Court for the Southern District of New York, and the individual rules of this Court. Defendants state as follows:

1-NY/2210061.5

I.    **Solow Realty And Its Employment Policies**

     1.    Solow Realty is a Manhattan-based real estate management and development company founded by Solow. Declaration of Kelly Ibrahim (the "Ibrahim Decl."), ¶ 2.

     2.    Solow is the founder and owner of Solow Realty. Id.

     3.    Cherniak is the Chief Executive Officer of Solow Realty. Id.

     4.    Bier is a former executive assistant to Solow. Id.

     5.    At all relevant times, Solow Realty maintained an employee handbook (the "Handbook") which was distributed to all of its employees. Id. at ¶ 5.

     6.    The Handbook contains an Equal Opportunity Policy Statement which states, in part, that Solow Realty will afford "equal employment opportunity for all employees and applicants, without discrimination with respect to an employee's or applicant's age, sex, religion, national origin, race, color, disability, marital status or sexual orientation." Id. at Ex. A (SRDC 00097: "1.02: Equal Opportunity Employer").

     7.    The Handbook contains a "Lateness and Attendance" policy which states, in part, that "[t]ardiness and absenteeism will prevent you from satisfactorily accomplishing your responsibilities at the Company and hinder the performance of other co-workers whose work may depend on yours. * * * Good and regular attendance will, therefore, be a condition of your employment." Id. (SRDC 00099: "2.02: Lateness and Attendance").

     8.    The Handbook contains a "Vacation Days" policy which reads, in part, as follows: "All regular full-time employees with at least six (6) months of employment, shall be entitled to ten (10) days vacation per year of employment accrued at the rate of six and one quarter (6.25) hours per month. * * * Requests for vacation time must be submitted for advance

approval to both your immediate supervisor and the Director of Administration <u>at least</u> three (3) weeks prior to the earliest date being requested." Id. (SRDC 00103-104: "3.03: Vacation Days") (emphasis in original).

9. The Handbook contains a "Sick Days" policy which reads, in part, as follows: "All regular full-time employees with at least three (3) months of employment, shall be entitled to a maximum of five (5) sick days per calendar year . . . If you are going to be out sick, you must notify the Director of Administration prior to the start of your scheduled workday and on a DAILY basis. All employees out sick may be required, at the request of the Company, to provide medical verification." Id. (SRDC 00103: "3.02: Sick Days") (emphasis in original).

10. The Handbook contains a "Personal Days" policy which reads, in part, as follows: "All regular full-time employees with at least four (4) months of employment, shall be entitled to a maximum of three (3) personal days per calendar year . . . Requests for personal time off must be submitted to both your immediate supervisor and the Director of Administration at least three (3) days prior to such requested day(s)." Id. (SRDC 00104: "3:04: Personal Days").

11. The Handbook contains a "Bereavement Leave" policy which reads, in part, as follows: "After the first six (6) months of employment, all regular full-time employees will be granted [] three (3) days paid time off in the event of a death in their immediate family (spouse, parents, children, brothers or sisters)." Id. (SRDC 00100: "2:07: Bereavement Leave").

12. The Handbook contains a "Personal Leave of Absence" policy which states, among other things, that in order to be eligible to take a personal leave of absence the employee "must be a regular full-time employee for at least one (1) year." Id. (SRDC 00100: "2.09: Personal Leave of Absence").

13. The Handbook contains a "Family Medical Leave of Absence" policy which states, among other things, that only regular full time employees who have completed "one (1) year of employment" are eligible to take a family/medical leave. Id. (SRDC 00100: "2.08: Family Medical Leave of Absence").

## II. Plaintiff's Personal History

14. In 1987, Plaintiff's parents and two sisters died in a house fire. Affidavit of Seth M. Kaplan, Esq. (the "Kaplan Aff."), Ex. A (Excerpts of Plaintiff Tracey Attis's Deposition Transcripts), 18:15-23:19.

15. Only Plaintiff and her one brother survived the house fire. Id.

## III. Plaintiff's Educational And Employment History

16. After completing high school, Plaintiff attended several colleges, including Hofstra University, St. John's University, New York Institute of Technology, and College of New Rochelle. Id. at 28:4-31:6. Plaintiff did not, however, receive a degree from any institution. Id.

17. Between April 2003 and November 2005, Plaintiff performed Human Resources ("HR") and other related services as an independent contractor for at least five different companies. Id. at 85:20-87:21, 93:22-24; 106:2-5.

18. Plaintiff began working as an independent contractor because she wanted "the flexibility to take on more than one project," and because she "thought [she] had a good idea for a consulting business;" namely to fill a "niche" for small companies by providing HR-related services that they did not currently possess. Id. at 86:3-87:18.

19. While providing services as an independent contractor, Plaintiff worked at various different companies at the same time. Id. at 86:13-16.

20. During the time Plaintiff worked as an independent contractor prior to being hired by Solow Realty, she simultaneously worked at five different companies for at least a portion of time. Id. at 87:14-21, 106:2-5.

21. Plaintiff provided her independent contractor services through NMGC Sky Group, a company she founded and operated for the purpose of providing these independent contractor services. Id. at 108:9-111:6.

22. During the time Plaintiff performed services for these various companies as an independent contractor, she did not receive any medical benefits from any of the companies which retained her. Id. at 111:7-9.

23. During the time Plaintiff performed services for these various companies as an independent contractor, she was left on her own to perform her job in the manner she saw fit on a day-to-day basis. Id. at 111:10-20.

## IV. Plaintiff's Mental Health History

24. Plaintiff was in therapy on and off for several years following the death of her family. Id. at 49:5-19.

25. Plaintiff began seeing her current psychiatrist, Dr. Pamela Silverman, a couple of years prior to being hired by Solow Realty in November 2005. Id. at 62:6-11.

26. Plaintiff began seeing Dr. Silverman because she believed that "therapy is healthy," and because she was going through a "rough time" following her break up with her ex-husband and wanted to keep her "head healthy." Id. at 62:12-21.

27. Plaintiff claimed that she was suffering from depression at the time she began seeing Dr. Silverman. Id. at 62:22-63:5.

28. Plaintiff stopped seeing Dr. Silverman after a couple of months of therapy because she felt that she was no longer suffering from depression. Id. at 146:5-23.

29. Plaintiff did not see Dr. Silverman at all in the 1 ½ to 2 year period preceding her hiring at Solow Realty. Id. at 145:20-146:4.

30. Plaintiff was feeling healthy with respect to her mental state during the two years preceding her hiring at Solow Realty. Id. at 146:24-147:3.

31. Plaintiff was not seeing any psychiatrists, taking any medications, or suffering from any severe personal problems during the two years preceding her employment with Solow Realty. Id. at 147:4-12.

32. Plaintiff was feeling healthy with respect to her mental state at the time she was hired by Solow Realty. Id. at 147:13-15.

## V. Plaintiff's Hiring At Solow Realty

33. Plaintiff was hired by Solow Realty on or about November 21, 2005 as its Chief Administrative Officer. Kaplan Aff. Ex. D (Complaint), ¶ 9.

34. As Chief Administrative Officer for Solow Realty, Plaintiff directly reported only to Solow and to no one else. Id. at ¶ 9; Kaplan Aff. Ex. A, 161:23-163:10, 167:4-22.

35. Plaintiff received a copy of Solow Realty's Handbook at the time she was hired in November 2005. Id. at 142:15-143:23; Kaplan Aff. Ex. B (Exhibits used at Plaintiff's deposition) (SRDC 00075: Defendants' Ex. 9 from Plaintiff's deposition).

36. Plaintiff was Solow Realty's only HR representative (other than an administrative assistant),[1] and had the ultimate responsibility for all of its HR functions. Kaplan Aff. Ex. A, 159:24-161:22.

## VI. Plaintiff Becomes An Independent Contractor For Solow Realty

37. Plaintiff admitted that, in or around March 2006, she agreed to provide services to Solow Realty as an independent contractor going forward. Id. at 226:17-229:6.

38. Following Plaintiff's new status as an independent contractor, Plaintiff's company, NMGC, Inc., provided weekly invoices to Solow Realty, which Solow Realty paid in full, without withholding any taxes. Id. at 229:7-230:20, 232:13- 233:11.

39. NMGC, Inc. has also served other clients, such as the Wass Group, after serving Solow Realty. Id. at 230:21-231:5.

40. While working for Solow Realty, Plaintiff did not receive any benefits from Solow Realty, including health or dental coverage. Id. at 139:25-140:3; Kaplan Aff. Ex. C (Defendants' First Set of Requests for Admission[2]), ¶ 49.

---

[1] Defendants dispute Plaintiff's allegation that any of Solow Realty's administrative assistants were dedicated to HR functions, but will assume it is true for the purposes of their motion for summary judgment.

[2] Defendants served their First Set of Requests for Admission on Plaintiff on July 2, 2007, to which Plaintiff never responded in any manner whatsoever. Therefore, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 36(a), all of the matters for which an admission was requested are thereby deemed admitted. See Fed. R. Civ. P. 36(a) ("the matter is admitted unless, within 30 days after service of the request, . . . the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter . . . .").

41.  While working for Solow Realty, Plaintiff worked independently without anyone providing her specific tasks to do. Kaplan Aff. Ex. A, 163:2-165:3; Kaplan Aff. Ex. C, ¶ 50.

42.  Plaintiff admitted that, as Chief Administrative Officer for Solow Realty, Solow never came to her with a list of things to do. Kaplan Aff. Ex. A, 163:21-164:2.

43.  Plaintiff admitted that, as Chief Administrative Officer for Solow Realty, she was never told by Solow Realty that she could not continue to take jobs with other companies while working for Solow Realty. Id. at 216:5-10.

## VII.  Plaintiff's Extended Absences Prior To The Death Of Her Brother

44.  Plaintiff admitted that attendance was an essential function of her position. Id. at 161:18-22; Kaplan Aff. Ex. C, ¶ 10.

45.  Based on Solow Realty's leave policies, during her seven full months of employment with the company, Plaintiff had accrued only 50 hours (or six days) of vacation, five sick days, three personal days, and three days of bereavement leave. Ibrahim Decl., ¶ 10.

46.  Plaintiff was not eligible for a personal leave of absence or a family medical leave of absence because she had not met the length of service requirements for such leave (i.e., at least a year of service with the company). Id.

47.  Prior to her brother's death in June 2006, Plaintiff had taken two personal days (November 29, 2005 and May 30, 2006), and six vacation days (January 25, 2006-January 27, 2006, and January 30, 2006 - February 1, 2006). This does not include the numerous days she left work early for a variety of health and personal reasons, for which the company does not keep formal records. Id. at ¶ 8.

48. Plaintiff has admitted that, prior to her brother's death in June 2006, she had taken a number of personal days. Kaplan Aff. Ex. A, 238:18-240:15.

49. Plaintiff has admitted that, in or around November 2005, she missed work for a scheduled court date. Id. at 234:22-24.

50. Plaintiff has admitted that she was out of work for a one-week vacation in January 2006. Id. at 234:25-235:3.

51. Plaintiff has admitted that, prior to her brother's death in June 2006, she took a day off to visit her family's grave. Id. at 236:4-7.

52. Plaintiff has admitted that, prior to her brother's death in June 2006, she took a day off to go to Florida. Id. at 238:14-17.

53. Plaintiff has admitted that, prior to her brother's death in 2006, she also left work early on occasion because she was sick. Id. at 235:16-18.

## VIII. Plaintiff's Brother Passes Away In June 2006

54. As of early June 2006, Plaintiff's brother was her only living immediate blood relative. Kaplan Aff. Ex. D, ¶ 12.

55. On or about June 5, 2006, Plaintiff's brother died from heart failure as a result of a cocaine overdose. Id.; Kaplan Aff. Ex. A, 234:10-12, 249:12-23.

56. Plaintiff had not been suffering from depression or depression-type symptoms in the years leading up to the death of her brother. Kaplan Aff. Ex. A, 238:10-13, 261:4-8.

57. Plaintiff alleges that she began to suffer from depression as a result of her brother's death. Kaplan Aff. Ex. D, ¶ 14; Kaplan Aff. Ex. A, 260:14-263:13.

58.     Between the date of Plaintiff's brother's death on or about June 5, 2006, and the date of the termination of Plaintiff's services with Solow Realty on or about July 17, 2006, Plaintiff came to work on no more than five or six days. Ibrahim Decl., ¶ 9; Kaplan Aff. Ex. C, ¶ 37.

### IX. Solow Realty Supports Plaintiff During Her Time Of Need

59.     A number of people from Solow Realty attended Plaintiff's brother's wake, including Solow, Bier and Cherniak. Kaplan Aff. Ex. A, 258:5-9.

60.     Solow comforted Plaintiff during the wake. Id. at 258:10-17.

61.     Within a few days of Plaintiffs' brother's death, Solow Realty provided Plaintiff with a $15,000 loan to help pay for the funeral costs. Id. at 254:19-257:19; Kaplan Aff. Ex. C, ¶ 24.

62.     Plaintiff alleges that Solow agreed to pay for the cost of any treatment costs that were not covered by her insurance. Kaplan Aff. Ex. A, 278:16-22, 284:17-285:3.

63.     Solow Realty paid Plaintiff the full fee for her services during the entire time she was absent from work following the death of her brother, which was approximately six weeks. Id. at 293:2-6, 340:24-341:2.

64.     Solow spoke to Plaintiff during her absence following her brother's death and remained very supportive; Plaintiff characterized Solow's support of her as "[a]bsolutely incredible." Id. at 308:19-310:11.

65.     During her absence from work following the death of her brother, numerous Solow Realty employees, including Solow, Cherniak and Bier, would call and check in on her almost daily. Id. at 304:25-305:15, 310:12-23.

66. On or about July 10, 2006, Solow Realty hired a temporary employee, Kelly Ibrahim, to perform some limited administrative HR tasks, such as reviewing Plaintiff's phone calls and e-mail messages, listening to her voice mail messages and assisting with other miscellaneous administrative tasks related to the company's HR functions. Ibrahim Decl., ¶ 3.

X. **Plaintiff's Extended Absences And Treatment At Two Mental Institutions**

67. Given her limited leave entitlement and the fact that she had taken a significant amount of leave prior to the death of her brother, Plaintiff far exceeded her accrued leave entitlement when she was out of work virtually every day during the six week period following the death of her brother. Id. at ¶ 11.

68. Plaintiff was out of work for one week following her brother's death on June 5, 2006. Kaplan Aff. Ex. A, 260:5-25; Kaplan Aff. Ex. D, ¶ 14; Ibrahim Decl., ¶ 9.

69. Plaintiff appeared for work on June 13, 2006, June 15, 2006, and June 19-22, 2006. Ibrahim Decl., ¶ 9.

70. On June 23, 2006, Plaintiff had an emotional breakdown when she arrived at work, visited with her psychiatrist after calming down, and never returned to work again. Kaplan Aff. Ex. A, 274:4-292:1.

71. Thus, in the six weeks between the date her brother passed away (June 5, 2006) and the date her services with Solow Realty were terminated (July 18, 2006), Plaintiff only worked, at most, on six days (June 13, 2006, June 15, 2006, and June 19-22, 2006). Ms. Attis was absent from work on every other day during this time frame -- a total of 25 days during this time frame. Ms. Attis was out on leave for more than three weeks straight at the time of her termination. Ibrahim Decl., ¶ 9.

72. On or about July 6, 2006, Plaintiff voluntarily checked herself into Columbia Presbyterian Hospital in New York, New York to seek therapy for her alleged depression. Kaplan Aff. Ex. A, 298:17-19; Kaplan Aff. Ex. D, ¶ 17.

73. Plaintiff stayed at Columbia Presbyterian Hospital for four days and voluntarily checked herself out on or about July 10, 2006. Kaplan Aff. Ex. A, 299:23-301:13; Kaplan Aff. Ex. D, ¶ 17.

74. During her stay at Columbia Presbyterian Hospital, Plaintiff was not terminated nor ever threatened with termination. Kaplan Aff. Ex. A, 346:8-347:4.

75. After she checked out of Columbia Presbyterian Hospital on July 10, 2006, Plaintiff did not return to work. Id. at 304:16-24.

76. However, Plaintiff would speak to numerous employees from Solow Realty, including Solow, Cherniak and Bier, on almost a daily basis, who would ask her about her mental state and how she was doing, and were being fully supportive of her. Id. at 304:25-307:19, 311:5-10.

77. Plaintiff admitted that it was about a week or more between the time she checked out of Columbia Presbyterian Hospital, and the time she checked into Four Winds Hospital. Id. at 305:16-306:5.

78. On or about July 17, 2006, Plaintiff checked herself into a second facility, Four Winds Hospital, for additional therapy. Id. at 316:5-8; Kaplan Aff. Ex. D, ¶ 19.

## XI. Solow Realty's Termination of Plaintiff's Services

79. Soon after Plaintiff entered the Four Winds Hospital, Solow told Bier that the company could no longer function without its Chief Administrative Officer, and instructed

1-NY/2210061.5

Bier to advise Plaintiff that Solow Realty would no longer be needing her services in light of her continued absence from work. Kaplan Aff. Ex. E, 43:7-46:5.

80. On or about July 18, 2006, Plaintiff spoke to Bier. Kaplan Aff. Ex. A, 326:9-14; Kaplan Aff. Ex. D, ¶ 20.

81. Plaintiff alleges that, in this conversation, Bier told Plaintiff that the company "need[ed] [her] back today" because she was involved in "too many things," and that if she could not do so, the company was going to have to replace her. Kaplan Aff. Ex. A, 326:18-327:23.[3]

82. Plaintiff further alleges that, in this conversation, she told Bier that she could not come into work that day and Bier then informed her that she was therefore going to have to be replaced. Id.; id. at 329:6-9.

83. Plaintiff further alleges that she asked Bier if the company was "going to offer [her] some sort of a package," and Bier replied that the company would probably just forgive the unpaid balance on the loan it had provided Plaintiff for her brother's funeral expenses. Id. at 327:16-18.

84. At the time of her termination, Plaintiff still owed approximately $12,000 of the original $15,000 that was lent to her. Id. at 334:4-14. Solow Realty forgave the unpaid balance of the loan upon her termination. Id.

85. Plaintiff acknowledged that Solow was the decision-maker with respect to her termination, and that Bier was only the messenger of Solow's decision. Id. at 362:10-364:4.

---

[3] Defendants dispute Plaintiff's characterization of this conversation, but will assume it is true for the purposes of their motion for summary judgment.

1-NY/2210061.5

## XII. Plaintiff's Lack Of Evidence To Support Her Claims Of Discrimination

86. Plaintiff has acknowledged that she never would have been terminated had she returned to work when she spoke to Bier on or about July 18, 2006. Id. at 347:21-25.

87. Plaintiff has expressly admitted that she was terminated because she "couldn't come back" to work when she spoke to Bier on or about July 18, 2006, and not for any other reason. Id. at 332:6-22.

88. Plaintiff has also expressly admitted that her allegations of disability discrimination are based solely on speculation since she "only can go on [her] speculation." Id. at 342:15-343:22.

89. In this regard, Plaintiff has acknowledged that she "can only guess that it is because [she] was still in a mental institution disabled that they fired [her]." Id. at 342:25-343:9.

90. The only other "evidence" to which Plaintiff cites to support her claim of disability discrimination is a conversation that was reported to her from a former co-worker Stephanie DeWitt. According to Plaintiff, Bier allegedly told another former co-worker, Tracey Dennis, that Plaintiff was not returning to work "because she is not right, her head is not right." Ms. Dennis allegedly reported this conversation to Ms. DeWitt, who allegedly reported this conversation to Plaintiff. Id. at 348:15-350:2.

91. Other than the fact that her termination occurred while she was in a mental institution and the alleged above-referenced conversation between Bier and Ms. Dennis, Plaintiff has acknowledged that she has no other evidence to support her claim of disability discrimination. Id. at 351:8-15.

1-NY/2210061.5

92. Plaintiff has acknowledged that she possesses no documents to support her claim that she was terminated because of her alleged disability. Id. at 359:10-359:17.

93. Plaintiff has acknowledged that there were no other Solow Realty employees who received a similar leave of absence during the course of her employment with the company. Id. at 352:11-14.

94. Plaintiff has acknowledged that Bier's only alleged wrongdoing in this action is the fact that she communicated Solow's termination message. Id. at 363:25-365:22.

95. Plaintiff has acknowledged that Cherniak's only alleged wrongdoing in this action is her allegation that he "supported [her] termination based on the fact that [she] was in a mental facility," and that this allegation was "[j]ust [her] opinion" and was "speculation on [her] part." Id. at 360:9-14, 367:15-24.

96. Plaintiff further acknowledged that she did not know whether Cherniak was even involved in the decision to terminate her employment; only that he was generally "involved in these types of situations." Id. at 360:15-361:6.

Dated: August 17, 2007  
New York, New York

MORGAN, LEWIS & BOCKIUS LLP

By: _____  
Mark Dichter (Admitted Pro Hac Vice)  
1701 Market Street  
Philadelphia, Pennsylvania 19103

Seth M. Kaplan (SK-0449)  
101 Park Avenue  
New York, New York  10178  
Tel. 212-309-6000